IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

KANDI KENNEDY o/b/o T.G.,     )
                                     )
        Plaintiff,        )
                                     )
     v.                )     CIVIL ACTION NO. 1:11CV148-SRW
                                     )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,     )
                                   )
        Defendant.      )

**MEMORANDUM OF OPINION**

Plaintiff Kandi Kennedy, on behalf of her minor child, T.G.,[1] brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her child's application for Supplemental Security Income under the Social Security Act.  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole

---

[1] The court refers to T.G. as the "plaintiff" in this memorandum of opinion.

to determine whether substantial evidence supports the ALJ's factual findings. <u>Davis v. Shalala</u>, 985 F.2d 528, 531 (11th Cir. 1993); <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145 (11th Cir. 1991). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983). Factual findings that are supported by substantial evidence must be upheld by the court. See <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence."). The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. <u>Davis</u>, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. <u>Cornelius</u>, 936 F.2d at 1145-46.

## BACKGROUND

Plaintiff's mother filed the present application for supplemental security income in November 2006, a few months after plaintiff's fourth birthday, alleging disability due to ADHD. (R. 123; Exhibits 1D, 1E and 2E). In a function report she completed at that time, plaintiff's mother indicated that plaintiff has limitations in understanding and using what she has learned, in that she did not at that time ask what words meant, know her telephone

number, or understand jokes, and she could not define common words or read capital letters of the alphabet. (R. 135). The mother further alleged limitations in plaintiff's behavior with other people, in that plaintiff did not show affection toward other children, play "pretend" with other children, or play board games. (R. 136). Plaintiff's mother also alleged limitations as to plaintiff's ability to take care of personal needs, as plaintiff did not put her toys away. (R. 137). Plaintiff's mother indicated that plaintiff had no limitations as to: her physical abilities; her ability to see, hear, talk, or communicate; or her "ability to pay attention and stick with a task[.]" (R. 131-37).

At the administrative hearing on September 23, 2008, plaintiff's mother testified that plaintiff is "very hyper in the evenings when she comes home from school," has mood swings, and she will "start screaming . . . and yelling, trying to fight" when told to clean her room. Some days, she is "all right" and "some days she's just really out of control[.]" (R. 44). The morning of the hearing, she "went to screaming and fighting" when her mother would not allow her to have a second piece of chocolate, and she did not want to put her shoes on or get in the car. Plaintiff's mother "had to have assistance" to get plaintiff under control. Plaintiff finally calmed down enough to listen and to get in the car. (R. 45). When plaintiff was four years old, she had "a little incident where she busted her cousin[']s head open. (R. 43). She has tried jumping out of the car while it was moving, and has played with knives and screwdrivers. (R. 45). She punched out the window in her mobile home with her fist, and has hit her sister for no reason. (R. 45-46). She has hit her stepmother in the face

3

and has tried to hit her mother and her step-dad, but has not tried to hit anyone else.  (R. 49).

She punches her legs, her head and the walls.  Plaintiff's doctors have told her mother to "let

her fight it out, but to try to make sure she does not hurt herself seriously.  (R. 46).  Plaintiff

is on medication but continues to have problems. (R. 46). The incident with the window

occurred when plaintiff's doctor had tried her on a new medication; the doctor then put

plaintiff back on her previous medications at an increased dosage.  (R. 46-47).  Plaintiff was

admitted to Laurel Oaks for a week beginning in late June 2007 after she tried to jump out

of the car and was trying to hurt herself and her sister, so that "they could figure out the

medication, and figure out what was actually going on."  (R. 48-49, 53).

Plaintiff has never had any mood problems at school or any fights with other children.

(R. 49).  She had problems with fidgeting, moving a lot, and focusing at the beginning of

kindergarten, but "when the medicine got corrected, she was doing a lot better."  Plaintiff's

kindergarten teacher recommended holding plaintiff back, but plaintiff' mother "didn't think

she needed to be held back" so she went into first grade.  (R. 50). She then had an "F in

Reading, a D in Math, a B in Language, a C in Spelling, and an A in conduct[.]" (R. 51).

Plaintiff's mother further testified that:

> When she comes home from school, well, we get her to sit, sit her down and
> do her homework, and after she does her homework she's playing with her
> sister or playing with the toys, but on the weekends, when she takes her
> medicine first thing in the morning, she will sit there and get a book, and try
> to read.  She will get her notepad and try to write. She won't play with no toys.
> She tries to concentrate on the, the reading and writing up until the evening
> comes, then at the evening time she wants to play.

(R. 51).  Plaintiff takes Ritalin first thing in the morning, then at noon, and she takes five milligrams in the evening so that she can do her homework. (R. 51).  Dr. Lopez had increased plaintiff's dosage because of "just after school doings where she could not focus.  She wouldn't sit down to do her homework.  It was wearing off by 3:00, by the time she got home from school."  (R. 52).  The school has not complained about the medication wearing off during school hours.  (R. 51-52).  Plaintiff takes Abilify at night and "sleeps pretty decent." Her doctor recently considered putting plaintiff back in the hospital, but wanted to see whether she would calm back down after returning to her previous medication.  Plaintiff's school had not called during this school year about academic concerns, and plaintiff's mother testified that "she's doing fine with behavioral in school."  (R. 53-54).

Plaintiff's mother had an incident with plaintiff in the post office – plaintiff was running around the post office while plaintiff's mother was checking out, and would not come back to her mother when she called her.  Plaintiff's mother grabbed plaintiff's hand "and was telling her to come on, and let's go to the car[.]" Another woman had to assist plaintiff's mother because plaintiff's mother had her other daughter with her also.  Plaintiff's mother also had an incident with plaintiff at Walmart. (R. 54). At the time of the hearing, plaintiff was in a 40-day program at school to determine whether she needed special education services; in the program, a teacher helps plaintiff one-on-one. (R. 55). If plaintiff's mother gives her instructions, plaintiff is "[n]ot really" able to complete the task, because "her mood kicks in. She don't want to do it, and that's when she starts screaming and

kicking, and fighting." (R. 55). She takes turns when playing with her sister, but if she has a mood swing while they are playing, she will hit her sister. (R. 55). She complies with routines like brushing her teeth before bed, and getting herself dressed and undressed, but sometimes has to be reminded to do so. (R. 56).

The medical records document plaintiff's psychiatric treatment by Dr. Josue Becerra between September 2006 – just after plaintiff's fourth birthday – through February 2007, and by Dr. Fernando Lopez from the spring of 2007[2] through the date of the ALJ's decision. The record also includes evidence regarding plaintiff's evaluations and counseling with psychologist Fred George, Ph.D., throughout the period from plaintiff's initial evaluation in September 2006 through the date of the ALJ's decision. (Exhibits 2F, 4F, 6F, 7F, 9F, 12F, 13F)(summarized *infra*).[3]

The ALJ issued a decision on December 12, 2008. (R. 19-34). She concluded that plaintiff has severe impairments of attention deficit hyperactivity disorder, bipolar disorder and mood disorder, but that she does not have an impairment or combination of impairments

---

[2]  The record of plaintiff's first evaluation by Dr. Lopez is undated, but occurred when she was "four and a half." (R. 232-33).

[3]  The treatment notes for Enterprise Behavioral Health bear signature blocks for four physicians – Drs. Lopez, Meghani, Tessema, and Becerra. (See, *e.g.*, R. 180). The treatment note form for Southeast Psychiatric Services in Dothan, Alabama, includes signature blocks for these four doctors and, also, for Dr. McGinn. (See, *e.g.*, R. 256). Thus, the record reflects that both Dr. Lopez and Dr. Becerra practiced in both locations. In addition to seeing these two physicians, plaintiff saw Dr. Meghani on occasion. She also was evaluated by a neurologist in May 2007 (Exhibit 3F) and by a team at UAB's Sparks Clinic in December 2007 (Exhibit 5F). Dr. Lopez and Dr. George continued to treat plaintiff after the ALJ issued her decision. (Exhibits 10F, 11F).

that medically equals one of impairments in the listings.  She further determined that plaintiff

does not have an impairment or combination of impairments that functionally equals the

listings.  The ALJ determined that the plaintiff has a "marked" limitation in acquiring and

using information, and a "less than marked" limitation in each of the other five domains.

(R. 27-34).  Accordingly, the ALJ concluded that the claimant has not been disabled as

defined in the Social Security Act since November 9, 2006, the date the application was filed.

(R. 34).  On January 6, 2011, the Appeals Council denied plaintiff's request for review.

(R. 1-5).  Plaintiff commenced the present action, seeking review of the Commissioner's

decision, on March 2, 2011.  (Doc. # 1).

## DISCUSSION

Plaintiff contends that the ALJ erred by rejecting the opinion set forth by her treating

physician, Dr. Lopez, in an August 29, 2008, medical source statement.  (Doc. # 14, pp. 6-13;

See Exhibit 8F).  She further asserts that the ALJ committed reversible error by failing to find

that she has "marked" limitations in the domains of attending and completing tasks,

interacting and relating with others, and caring for oneself.  (Id., pp. 13-15).

### Child Disability

"Federal regulations set forth the process by which the SSA determines if a child is

disabled and thereby eligible for disability benefits." Shinn ex rel. Shinn v. Commissioner

of Social Sec., 391 F.3d 1276, 1278 (11th Cir. 2004) (citing 42 U.S.C. § 1382c(a)(3)(C)(I)

and 20 C.F.R. § 416.906).  "The process begins with the ALJ determining whether the child

is 'doing substantial gainful activity,' in which case she is considered 'not disabled' and is ineligible for benefits." Id. (citing 20 C.F.R. §§ 416.924(a), (b)). "The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if she has 'an impairment or combination of impairments that is severe.'" Id. (citing 42 U.S.C. §§ 416.924(a), (c)). "For an applicant with a severe impairment, the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child." Shinn, 391 F.3d at 1278  (citing 20 C.F.R. §§ 416.911(b), 416.924(d).) This determination is made according to objective criteria set forth in the Code of Federal Regulations (C.F.R.).  As the Eleventh Circuit has explained,

> [t]he C.F.R. contains a Listing of Impairments ["the Listings", found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ("impairment") from which a person can suffer, sorted into general categories. See id. § 416.925(a). For each impairment, the Listings discuss various limitations on a person's abilities that impairment may impose. Limitations appearing in these listings are considered "marked and severe." Id. ("The Listing of Impairments describes ... impairments for a child that cause[ ] marked and severe functional limitations.").
>
>   A child's impairment is recognized as causing "marked and severe functional limitations" if those limitations "meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings." Id. § 416.911(b)(1); see also §§ 416.902, 416.924(a). A child's limitations "meet" the limitations in the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment. A child's limitations "medically equal" the limitations in the Listings if the child's limitations "are at least of equal medical significance to those of a listed impairment." Id. § 416.926(a)(2).

Id. at 1278-79. "Finally, even if the limitations resulting from a child's particular impairment[s] are not comparable to those specified in the Listings, the ALJ can still

conclude that those limitations are 'functionally equivalent' to those in the Listings. In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities. The C.F.R. specifies six major domains of life:

> (i) Acquiring and using information;
>
> (ii) Attending and completing tasks;
>
> (iii) Interacting and relating with others;
>
> (iv) Moving about and manipulating objects;
>
> (v) Caring for [one]self; and
>
> (vi) Health and physical well-being."

Shinn, 391 F.3d at 1279 (citing 20 C.F.R. § 416.926a(b)(1)). "The C.F.R. contains various 'benchmarks' that children should have achieved by certain ages in each of these life domains." Id. (citing 20 C.F.R. §§ 416.926a(g)-(l)). "A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked' limitations in two of the domains [above], or an 'extreme' limitation in one domain." Id. (citing 20 C.F.R. § 416.926a(d) and § 416.925(a)).

### Treating Physician's Opinion

"If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic

techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight." Roth v. Astrue, 249 Fed. Appx. 167, 168 (11th Cir. 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)). "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)). "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." Pritchett v. Commissioner, Social Security Admin, 315 Fed. Appx. 806 (11th Cir. 2009)(unpublished opinion)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)). The Eleventh Circuit has found good cause for discounting treating physicians' opinions that are "inconsistent with their own medical records," Roth, supra (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) or "when the opinion appears to be based primarily on the claimant's subjective complaints of pain." Freeman v. Barnhart, 220 Fed. Appx. 957, 960 (11th Cir. 2007)(citing Crawford, supra). "The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. Carson v. Commissioner

10

of Social Sec., 373 Fed. Appx. 986, 988 (11th Cir. Apr. 20, 2010)(citing Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985)).

## Summary of the Evidence

Plaintiff recites the aspects of her treatment records that support her claim (Doc. # 14, pp. 8-13), and the court has considered this evidence, along with all of the other evidence of record. However, plaintiff's summary of the evidence omits portions of the plaintiff's treatment notes that support the ALJ's conclusions that Dr. Lopez' assessment – to the extent it suggests functional equivalence – is inconsistent with the treatment notes and that plaintiff has "less than marked" limitations in all of the domains except acquiring and using information. For instance, plaintiff argues that during his "initial psychiatric evaluation dated September 21, 2006, [Dr. Lopez] made clinical findings of hyperactive motor activity and broad affect (Tr. 194).  (Doc. # 14, p. 8). While this is so, in that same evaluation, the doctor[4] marked plaintiff's affect (while "broad") as "appropriate."  (R. 194).  He further wrote that plaintiff's "behavior while at this office may be considered normal for her age" and noted her mood to be "normal" and her attention span "fair[.]" (R. 194).  Plaintiff points to her mother's report, on November 2, 2006, that "she was very aggressive towards others and not sleeping (Tr. 190)."  (Doc. # 14, p. 8).  The treatment note states, "Mother request[s] start of Pharmacotherapy as pt. not sleeping and very aggressive – brings knives to her room."  Dr. Becerra again noted plaintiff to be hyperactive, her mood normal and her attention span fair.

---

[4] The initial evaluation was conducted by Dr. Becerra, not Dr. Lopez.  (See R. 190, 195).

(R. 190).  He rated her judgment/insight as "Below Average"and her impulse control as "Poor."  Beside the section for "Progress Toward Treatment Goals," Dr. Becerra wrote, "Guarded – ↓Parenting skills noted[.]"  He started plaintiff on Tenex, but also gave a "[r]eferral for counseling/Parenting skills[.]" (Id.).

Plaintiff also cites her mother's report to Dr. Becerra on November 9, 2006 – the day she filed the present application for benefits – that "she was still not sleeping well (Tr. 189)," but omits her report to the doctor that plaintiff was "doing better" and had experienced "significant behavioral improvement in last week after commencement of Tenex." (See Doc. # 14, p. 8; R. 189).  Dr. Becerra noted that Dr. George's psychological testing was conclusive of "ADHD hyperactive-impulsive type" and added Olanzapine to her medication regimen. (R. 189).  Plaintiff next argues that, "[o]n November 16, 2006, Dr. Lopez reported that [plaintiff] was still very hyper despite some calming due to Zyprexa (Tr. 183)."  (Doc. # 14, p. 8)(footnote omitted).[5]  The record cited by plaintiff is actually a progress note by Dr. George, the psychologist, rather than an evaluation by Dr. Lopez.  (See R. 183, R. 286-87). On that date, Dr. George recorded the report of plaintiff's mother as follows:

> Calmed down a little bit but still very hyper around other kids. Tenex help for 3 days – Zyprexia [sic] – has helped with sleep. Still hyperactivity as was b4 except around other kids. Not as mean as was. Still has days when Angry. Being evaluated by Mr. Freel for sexual abuse.

(R. 183). On that same day, plaintiff was evaluated by Dr. Becerra. He noted plaintiff's

---

[5]  Zyprexa is a brand name for the generic drug Olanzapine.  See *Physician's Desk Reference* (65th ed. 2011) at p. 1850.

mother's report that plaintiff was "'Hyper at times in daytime, sleeping OK, not eating[.]'"
On mental status examination, he noted plaintiff's behavior as "Passive," her affect as
"Euthymic" and her psychomotor activity as "Normal."  He adjusted plaintiff's medication
schedule and dosage.  (R. 188).

Plaintiff next points to her mother's report to Dr. Becerra on November 30, 2006, that
"'she's worse. [She's] going back to the way she was before treatment.' (Tr. 187)" (Doc. #
14, p. 8).  On November 30, 2006, Dr. Becerra noted this report from plaintiff's mother and,
also, her claim that plaintiff was "more hyper" after taking her Zyprexa at night.  Dr. Becerra
observed that the hyperactivity was "more likely a consequence of 'cough medicine' she's
getting[.]" which was of an "[u]nknown name & dose – prescribed by her general
doctor/pediatrician."  On mental status examination, he noted plaintiff's attention span as
fair, her behavior as passive and her psychomotor activity as "Retardation."  He wrote, "Pt.
sits still, does not talk much, appears to have URI."  He discontinued plaintiff's prescription
for Zyprexa, increased her dosage of Tenex and told plaintiff's mother to bring "ALL
MEDS" to the next visit.  (R. 187).[6]  Plaintiff argues that she "was noted to have poor sleep
on December 7, 2006 (Tr. 183)."  (Doc # 14, p. 8).  Dr. Becerra noted plaintiff's mother's
report of decreased sleep and appetite, increased hyperactivity, of "behavioral deterioration

---

[6] Plaintiff argues, "Dr. Lopez observed on at least two occasions that T.G. was hyperhytmic
[sic] (Tr. 187, 181)."  (Doc. # 14, p. 11).  On November 30, 2007, Dr. Becerra checked the block for
"*Hypo*thymic," not "*Hyper*thymic."  (R. 187)(emphasis added).  Dr. Becerra noted plaintiff to be
hyperthymic on a single occasion, on January 11, 2007, at a time when plaintiff's mother was
reporting that she was satisfied with plaintiff's "current evolution on meds started last month."
(R. 182).

after Zyprexa [discontinued] last week" and that the higher dosage of Tenex "'did not work[.]'" On mental status examination, however, Dr. Becerra observed that plaintiff was fully alert, her behavior was normal, her attention span was "Good," and her psychomotor activity was normal. He noted her judgment/insight to be below average. Dr. Becerra wrote, "Pt. sits still, no objective signs consistent [with] Mom's report[.]" He decreased the Tenex dosage and restarted plaintiff on Zyprexa. (R. 185).

On this same date, plaintiff's mother told Dr. George that plaintiff had started throwing things at her, being destructive, running away in the grocery store, and being aggressive to the dog and to her sister; she reported that plaintiff had put a plastic bag over the dogs's head and had pushed her sister down and hit her. (R. 206). Plaintiff cites evidence that, on December 14, 2006, she was "still very hyperactive and running away from her mother (Tr. 184)." (Doc. # 14, p. 8). In the treatment note for that day, Dr. Becerra wrote:

> "She's still running, she is worse," mother reports. Again, pt. is seen here calm, sits or stands still, no objective signs of hyperactivity noted. Mother agrees for me to continue advising meds based on Dr. George's testing which indicated ADHD . . . . Mom reports pt. eating and sleeping OK but continues to [complain of] alleged hyperactivity and defiance.

(R. 184). On mental status examination, Dr. Becerra noted plaintiff to be fully alert, her behavior passive, her attention span good, her affect euthymic, her recent memory and impulse control fair, her judgment/insight to be below average and her psychomotor activity normal. (Id.). He discontinued Tenex and Zyprexa and started plaintiff on Focalin XR and Clonidine. (Id.). On January 2, 2007, Dr. George noted plaintiff's mother's report that, after

Dr. Becerra changed her meds to Focalin and Clonidine, plaintiff slept better and was less "hyper," but that she still had mood swings, anger, and goes into her room and cries when she gets depressed.  (R. 183).

On January 11, 2007, Dr. Becerra noted that plaintiff was hyperactive and wrote, "opposite behavior of the one noted last month was seen here today."  He again observed that plaintiff was fully alert and her behavior was "Normal."  He recorded plaintiff's mother's report that plaintiff was "Better" and wrote, "Mother satisfied [with] current evolution on meds started last month."  (R. 182).[7]  The following week, plaintiff's application for benefits was denied at the initial administrative level.  (Exhibit 1A, 1B, R. 59-64).  Plaintiff was next seen by Dr. George on January 30th.  (R. 181).  Dr. George wrote, "Behavior regressed destructive + dangerous." (R. 181). Dr. George wrote another letter to Dr. Becerra describing plaintiff's mother's report of her behavior. He wrote:

> [Plaintiff] was in the office with her mother today.  Her mother indicated that since her last visit, [plaintiff] has run away from her at Wal-Mart and had put a plastic bag over the dog's head and her sister's head. In addition, she has threatened to hit her mother. Her mother indicated that her temper and rages happen three or four times a day and have become uncontrollable, occurring any time of the day. These rages are occurring at the severity and frequency as they did prior to her beginning treatment. In addition, her sleep difficulties have worsened to the degree that she is staying up as late as 1:00 a.m. Her mother reported that Toni's symptoms, which initially were much improved, have returned to the level prior to her treatment.

(R. 205).  A couple of days later, on February 1, 2007, plaintiff returned to Dr. Becerra. Dr. Becerra wrote, "'Bad again' was 'running away in WallMart [sic], not sleeping,' mom rep."

---

[7]  Plaintiff omitted any reference to this treatment note in her brief.  (See Doc. # 14, pp. 8-9).

(R. 180).  Although he noted plaintiff's judgment/insight to be below average, he observed that her attention span was fair, she was fully alert and her behavior was normal in the mental status examination for that visit. (Id.). On that day – as he had for every office visit since November 2, 2006 – Dr. Becerra noted that plaintiff's "Progress Toward Treatment Goals" was "Fair." (R. 180; see also R. 182, 184, 185, 187, 188, 189).

After the February 1, 2007, visit, plaintiff did not return to Dr. Becerra for treatment for ten months. Instead, she began seeing Dr. Lopez at Enterprise Behavioral Health Services.  (R. 232-33).[8] Dr. Lopez' initial treatment note is undated, but the office visit took place when plaintiff was four and a half years old, so it was sometime in the spring of 2007. (See R. 232). Dr. Lopez wrote:

> This is a four and a half year old Caucasian youngster who is brought in by her mother who is, of course, the informant. She stated that for the past two years this child has been very hyper, does not sleep, cannot sit still, and makes statements like, "I'll kill you," whenever she is corrected or guided.  She bangs her head against the wall.  All of these behaviors have been escalating.
>
> This child is the oldest of two. Was born full term with normal delivery and normal developmental milestones. The mother smoked cigarettes. she has mild allergies to dust but no other allergies know[n].
>
> **FAMILY HISTORY:**
> There is bipolar disorder on the mother's side. She is going to the mental health center for treatment for this condition. On the father's side, there is ADHD. Mother divorced the father and now has another husband and doing okay with him.
>
> **MENTAL STATUS EXAMINATION:**

---

[8]  All of plaintiff's visits with Dr. Becerra had also been at Enterprise Behavioral Health Services.  (See Exhibit 2F).

This youngster is a cute little blond, and I called her Goldilocks.  Beautiful blond, blue-eyed youngster.  She does not verbalize too well but she understands what is going on. Her mood was not depressed or manic. There is no thinking disorder detected. Affect was bright and appropriate.  Speech is of a four-year-old girl. She is inquisitive and appears bright.

Psychological testing given prior to this interview. This youngster is described as a young girl who engages in extremely dangerous behavior and potential harmful behavior.[9]  She cannot sleep well, has mood swings, and is hyperactive. She throws things at her mother, has been aggressive toward the sister, and she even put a plastic bag over the doll head, loses control immediately, and runs in the grocery store and is defiant for such a little girl.

(R. 232).[10]  Dr. Lopez diagnosed attention deficit disorder, impulsive and overactive type, and bipolar disorder on Axis I, and allergies and sleep problems on Axis III. (Id.). He concluded:

**RECOMMENDATIONS**:
Several regimens of medications have been tried for the past several months and at present, she is taking Focalin XR 10mg in the morning and Focalin 5 mg in the evening.  The medication wears out around 3 o'clock and she is hard to handle. She is also taking Risperdal 0.5 mg twice a day for her bipolar disorder, and she is under counseling. This young lady suffers from a chronic psychiatric disorder that is going to require long term treatment.  She needs to continue with the aforementioned regimen.

(R. 233).

On May 2, 2007, plaintiff sought treatment from Dr. Meghani at Southeast Psychiatric

---

[9]  Dr. George conducted plaintiff's initial psychological evaluation several months earlier, on September 21, 2006.  In his summary of the evaluation, Dr. George wrote, "[Plaintiff] is a 4-year-old female who is described by her mother as extremely active and engages in dangerous and potentially harmful behavior.  She also has significant sleep difficulties.  Other emotional, mood, and thinking difficulties were not apparent.  The evaluation indicates that [plaintiff] meets the diagnostic criteria for attention deficit hyperactivity disorder, impulsive/overactive type."  (R. 207).

[10]  Plaintiff's mother gave a substantially similar report to Dr. George on April 13, 2007. (R. 204).

17

Services in Dothan.  Dr. Meghani noted that plaintiff was "referred by Dr. Stinson" and that

her mother's "Chief Complaint" was that "[h]er medications are not working. She is doing

really bad and temper fits." (R. 250).  Dr. Meghani wrote:

> **HISTORY OF PRESENT ILLNESS:** The patient so far is being treated by
> the primary care doctor, Dr. Stinson, in Enterprise.[11]  She has been reported as
> hyper, there are moments when she would calm down.  She would throw
> temper tantrums, sometimes two hours straight.  She would throw out things,
> anger, aggression, hostility, mood swings were reported. The current
> medications that she is taking right now, which include the Focalin and the
> Risperdal, are not working.

Dr. Meghani conducted a mental status examination and noted:

> The patient was alert and she was oriented. Her behavior at this time seems
> normal. Attention span, however, was poor. Her thought process is goal
> directed. Thought content negative for hallucinations or delusions. No suicidal
> ideation or homicidal thoughts reported. Mood okay. Affect has been reported
> as labile. Memory fair. Impulse control poor. Insight and judgment below
> average. Psychomotor activity is one of agitation, hyperactivity, and fidgety.

(R. 251).[12]  Dr. Meghani changed plaintiff from Risperdal to Depakote. (Id.). Two days later,

Dr. Meghani saw plaintiff as a "work-in" after she experienced "cotton mouth" and "started

jerking really bad." He noted, "Likely it was a Depakote allergic reaction, and she was in the

ER last night.  Depakote has been discontinued and only medicine is Focalin."  (R. 249).[13]

---

[11] It does not appear that Dr. Meghani was aware of plaintiff's previous history of treatment
by Dr. Becerra at Enterprise Behavioral Health.

[12] Under "Social History," Dr. Meghani wrote, "No physical or sexual abuse reported."
(R. 250).  However, according to Dr. George, plaintiff's forensic interviews had been completed by
April 13, 2007 (R. 204), and "[i]t was concluded that Toni had been sexually abused" (R. 283).

[13] Dr. Meghani suggested follow-up with Dr. Kothawala "to rule out seizure as a possible
etiology." (R. 249).  Dr. Kothawala, a pediatric neurologist, had seen plaintiff two days earlier, on
May 2, 2007, and had performed an EEG that was abnormal, showing "diffuse slowing" suggestive

On May 20, 2007, plaintiff saw Dr. Lopez at Southeast Psychiatric Services in Dothan. Dr. Lopez wrote:

> This youngster is having numerous difficulties. He [sic] is very inquisitive and very active. There is a rich history in the family of bipolar disorder on both sides of the family, the mother and the father. There is history of psychiatric evaluation at Child Development clinic in UAB and neurological evaluation by a pediatric neurologist.[14] We have been discussing with the mother so we can have a more comprehensive evaluation of this youngster. About the Depakote that was given previously, I did agree with her for it to be discontinued. We are going to try Lamictal chewable table 10 mg twice a day and to observe for the rash. We will follow all along.

(R. 248). On May 22, 2007, Dr. George observed that plaintiff had a rough weekend but was doing better on her medications. (R. 227). In June 2007, plaintiff's mother told Dr. George that plaintiff's medications were not resolving plaintiff's temper or impulsivity and that her behavior worsened after 3:30, which Dr. George thought was suggestive of a rebound from plaintiff's stimulant medication. Dr. George also noted that, a few days previously, plaintiff's mother "had to have a person at the post office help carry her out." (R. 203).[15]

---

of a diffuse encephalopathy of metabolic, degenerative or vascular origin." He recommended clinical correlation. (Exhibit 3F, R. 200). On May 7, 2007, Dr. Kothawala saw plaintiff again. He noted no abnormalities in her physical examination. He decreased her Focalin dosage, discontinued her Benadryl, and started her on Equattro. Although Dr. Kothawala recommended follow up in two weeks, there is no indication in the record that plaintiff returned to Dr. Kothawala for further evaluation. (R. 199).

[14]  Plaintiff provided the record of the neurologist's evaluation (Exhibit 3F), but did not provide any record of a psychiatric evaluation at UAB. The only UAB evaluations of record are at Exhibit 5F, a UAB child development clinic evaluation that was conducted in December 2007 and January 2008. (See summary at R. 216).

[15]  As noted above, plaintiff's mother explained that she "had to have another lady assist me to getting her outside into my car because I had two, my daughter with me, my other daughter. (R. 54). In early June 2007, when Dr. George wrote this note, plaintiff's sister was just over one year

In an undated progress note that appears to be the next treatment by Dr. Lopez reflected in the administrative record, probably in July or early August of 2007,[16] Dr. Lopez wrote:

> I have been treating this almost 5-year-old Caucasian youngster for the past year[17] as she has been agitated, restless, and aggressive. She has had numerous combinations of treatments, and because of lack of response with her treatment, I recommended admission to the child psychiatric unit at Laurel Oaks where she spent several days and was treated and discharged.[18] According to the mother, she continues to be the same.
>
> The problem is there is bipolar disorder and ADHD in both sides of the mother and the father's side that is under treatment. The parents are separated, and the mother does not know what to do with the child who is on the surface pretty, blonde, cute, but has some serious problems that are not responding with the manipulations of counseling or therapy. Even clonidine wound her up, and we have tried all kinds of Ritalin and Adderall, and this youngster continues to be difficult.An EEG was done by a pediatric neurologist, and the clinical impression is there is diffuse slowing suggestive of diffuse encephalopathy but we do not know the etiology. So all of this is going on in this little girl's brain, and probably the next step will be to send her to the UAB Psychiatric or Neurological department for evaluation. The problem is aggressive behaviors that involve others with hitting, biting, and throwing things.
>
> At any rate, school is going to start and the mother is very concerned because she is probably going to be kicked out. We have exhausted all resources, and this youngster continues to be difficult. She is on Metadate CD, Equetro, and

---

old.  (See R. 191, 204).

[16]  This is an estimate, based on the child's date of birth.  (See R. 231).

[17]  As noted above, Dr. Lopez first treatment note of record indicates that he evaluated the plaintiff when she was "four and a half[.]"  (R. 232).

[18]  Plaintiff did not submit her records from Laurel Oaks for the ALJ's consideration. However, the hospitalization appears to have occurred sometime in late June 2007.  (See R. 225-26). On July 5, 2007, Dr. George recorded plaintiff's mother's report that she "acted 'good' while in hospital. Since been home has been having extreme meltdowns." (R. 225).

Abilify 5 mg daily.

(R. 231).

On October 29, 2007, plaintiff saw Dr. Meghani at Enterprise Behavioral Health.  Dr. Meghani noted, "Still with the bad temper at times, hitting the mother. Diagnosis of disruptive disorder."  Dr. Meghani noted psychomotor activity of agitation, hyperactive and fidgety. He further noted poor memory, impulse control and below average judgment/insight, circumstantial thought process, and labile affect.  He observed that her behavior was normal, and her orientation, thought content and mood "OK."  He recommended follow up with Dr. Lopez in thirty days.  (R. 230, 247).

The following month, however, plaintiff sought treatment from Dr. Becerra at Enterprise Behavioral Health instead. On November 29, 2007, Dr. Becerra wrote:

> "I need her Ritalin," mother reports.

> 5 y/o WF, kindergar[t]en student.  I saw Pt. last time on 2-1-07[.]  Mother feels "she's doing better" after she started to give [plaintiff] her Ritalin 10 mg po [twice a day] from old supply – although Dr. Lopez has Rx'd once daily only.

(R. 229).  Dr. Becerra assessed her progress toward treatment goals as "Guarded," but noted "Normal" psychomotor activity and "Normal" behavior. (Id.).

Plaintiff returned to Dr. Lopez on December 21, 2007. Dr. Lopez wrote:

> His [sic] mother brought her to the office today after a five-month hiatus.  She stated that he [sic] is going to be going to UAB to be tested finally. Is involved in speech impediment classes and speech therapy and is in special education one-on-one.  She reminded me that when she was pregnant, she had toxemia and she had numerous developmental delays in addition to the genetic load for bipolar disorder in her and her father. The mother attends the mental health

21

center in Enterprise regularly[.]

> Prescriptions was given. We will follow all along. I asked her to write her
> name in my chart and she did. He [sic] is developing nicely. [V]ery
> affectionate with me, and we will follow all along.

(R. 246).

On December 18, 2007, and January 30, 2008, plaintiff went to the child development clinic of UAB's Civitan International Research Center Sparks Clinics for evaluation. (Exhibit 5F). The evaluation team included a speech/language pathologist, special education evaluator, optometrist, audiologist, occupational therapist, and medical social worker. (R. 216). At the December 18th occupational therapy evaluation, plaintiff's mother reported that plaintiff was "independent in most activities of daily living; she is encouraged in brushing her teeth, occasionally assisted in brushing her hair, and is still learning to tie her shoes." (R. 211). She told the therapist that plaintiff was "in a regular classroom with services of a one-on-one teacher's aide (including repeating of instructions as needed)." Plaintiff's mother stated that "the main concern for [plaintiff] is her behavior and temper." (R. 209). The occupational therapist described plaintiff's behavior during the evaluation as follows:

> [She] was engaged and curious of her environment, transitioning easily from
> the waiting room to the occupational therapy space. The evaluation period
> began structured testing and [she] made appropriate eye contact and facial
> expressions during the testing period. She did not appear to have difficulty
> attending to task and was easily re-directed; she did not appear to have
> difficulty understanding testing instructions. The transition from structured
> testing to free play was made without difficulty.

(R. 210). The occupational therapist determined that plaintiff's grasping skills were one standard deviation below the mean on the Peabody Developmental Motor Scale, and that her visual-motor integration was at the mean. Her overall "fine motor quotient" was 91, which fell in the "average" range of 90-100.  (Id.). The occupational therapist concluded, "Based on the test scores and observation, no occupational therapy services are recommended at this time." (R. 209). A special education evaluator determined that plaintiff's scores upon readiness testing, using the Bracken Basic Concept Scale - Revised, indicated a "delay of 9 months" with a "Concept Age of 4 years 6 months[.]"  The evaluator concluded that plaintiff was "at risk for Learning Disabilities in the future, and should be monitored closely." (R. 212). She made a number of recommendations, including that the school consider providing intensive math, reading, and written language intervention services.  (Id.; see also R. 212-14).[19] A speech-language pathologist evaluated plaintiff on January 30, 2008. (R. 220-23).  The pathologist noted that plaintiff "attends Harrand Creek Elementary school, where she is in kindergarten" and that she "does not currently receive any special education services while in school. Prior to this evaluation, [she] reportedly has never received a speech/language evaluation or therapy." (R. 221).[20]  With regard to plaintiff's "behavior/social skills," the evaluator wrote:

---

[19]  The audiologist and optometrist had no recommendations after evaluation, other than for later re-evaluation.  (R. 217, 219).

[20]  This is contrary to the report that plaintiff's mother gave to Dr. Lopez on December 21, 2007.  (R. 246).

[She] was a pleasure to work with during the evaluation. Upon entering the testing room [she] began playing with the toys in the room while her mother was engaged in a parent interview. Ms. Kennedy did not express any concerns with [plaintiff's] behavior or social skills during the interview. She noted that [plaintiff] "does not talk much".

When it became time to transition from play to formal testing, [plaintiff] did not exhibit any difficulty separating from her mother, who was escorted to an adjoining observation room to watch the remainder of the evaluation. [Plaintiff] was observed to transition from play to formal testing without difficulty. To begin with, [she] appeared to be shy; however, she quickly warmed up to the evaluator. [She] participated willingly in all testing items and did not need any reminders to attend to testing.

With regard to pragmatic skills, [she] was observed to make and maintain eye contact appropriately during conversation. At the beginning of the evaluation, [she] only participated in conversational turn taking when initiated by the evaluator; however, by the end of the session, she was observed to initiate conversation more readily. [Her] facial affect, tone of voice and posture were all noted to be appropriate throughout the assessment.

(R. 221). The evaluator assessed plaintiff's receptive and expressive language skills formally, using the *Clinical Evaluation of Language Fundamentals Preschool, 2nd Edition,* and found them to be in the average range and "within normal limits." (R. 221-22). On informal assessment of her speech, the evaluator noted some "developmental articulation errors" that "are expected to improve as [she] gets older" and recommended that plaintiff's mother and teachers monitor her speech development and request further evaluation "if concerns arise." She found the components of plaintiff's voice ("such as resonance, pitch and loudness") and her fluency to be "within normal limits." (R. 222). The speech pathologist concluded that "[s]peech/language therapy is not warranted at this time." (R. 223). The Sparks Clinic evaluation team findings were summarized as follows:

> On this present evaluation [plaintiff] did demonstrate delays in her academic testing. She is felt to be at risk for Learning Disabilities in the future. [Plaintiff], for the present time should be monitored closely in all subject areas. Any interventions related to her academic improvement should be implemented as needed. She would benefit from updated academic testing within the next two years.

(R. 216).

Just over two months later, on April 29, 2008, Dr. George performed a psychological evaluation to assess plaintiff's "intellectual and achievement abilities to determine her readiness for 1st grade." (R. 282). Within his description of her history, Dr. George wrote:

> [Plaintiff] had been sexually abused at age 4. She had the forensic interviews through ICAS. It was concluded that [she] had been sexually abused, but she has not named the perpetrator. Following that for a period of approximately one year, she would not venture into the treatment room without her mother. She engaged during that time in parallel play with no interaction with the therapist. Approximately nine months ago, [she] would allow her mother to stay in the hallway and would play for short periods of time. After two o[r] three visits of doing this, she saw a large stuffed animal in the room which she immediately went to and interacted with, and then began interacting with me. Since that time, she has come into the play room for individual sessions by herself. She interacts with the therapist throughout her session time. Since that time, her anger outbursts and mood swings have shown gradual improvement. At the present time, she has occasional temper outbursts but these are much improved.

(R. 283). In the section for behavioral observations and mental status, Dr. George wrote:

> [Her] personal hygiene was good and she was neatly dressed and groomed. Her activity level during the evaluation was within normal limits, as was her rate of speech and conversation. She related comfortably to the examiner.
>
> Her mother described her mood as within normal limits. Her affect was normal and her range of effect was stable and appropriate.
>
> [She] was alert and oriented to time, place, person and situation. Her attention

and concentration during the interview were within normal limits.  No obvious
impairments were observed in her memory.

No loose associations, tangential or circumstantial thinking was observed.  No
hallucinations, delusions, or ideas of reference were reported or observed.

(Id.).  Dr. George summarized the results of plaintiff's evaluation and testing on that day as

follows:

[Plaintiff] is a 5-year-old kindergarten student.  Despite her late birthday,
individual academic testing overall falls in the middle of the average range on
the Woodcock-Johnson III.  Her using age norms falls in the above average
range of brief reading and writing, while the grade norms falls in the middle
of the average range.  She has a relative weakness in her mathematics
achievement, which falls in the low average range of her age norms.  However,
this is consistent with her intellectual functioning, which overall falls in the
low average range.[Her] mother reported [that she] continues to have difficulty
completing her work in the school setting to the degree that her teacher had
suggested retaining her in kindergarten.  However, at home with further
explanation of the work, [she] was able to complete her school work and
homework according to her mother.  Overall, [her] teacher's ratings overall
indicate [plaintiff] has shown great improvement in her impulsivity and
overactivity and significant improvement in her symptoms of inattention and
organizational difficulties.  However, on individual items, at school she very
often makes careless mistakes because of her attention problems, has
difficulties sustaining attention in her school work, and does not seem to listen
when spoken to.  According to her teacher, these difficulties result in
problematic performance in her reading, mathematics and written expression
in the classroom situation, as well as difficulties following directions and
completing her assignments.

(R. 282).

Plaintiff had seen Dr. Lopez on February 20, 2008, several weeks before her

evaluation with Dr. George, and she returned to Dr. Lopez on April 23rd and June 27th.

(R. 243-45).  Dr. Lopez' treatment notes for this period include only the mother's reports and

plaintiff's medications on these occasions; he did not record any observations in the mental status examination portion of the treatment notes for these visits. (Id.). In his notes for therapy sessions in June 2008, Dr. George observed on mental status examination that plaintiff was well-groomed, with normal motor activity, good attention span, no psychosis, normal mood, normal sleep, good appetite, appropriate affect and "normal" or "great" speech. (R. 280-81). He noted plaintiff's mother's report on June 17th that plaintiff was "[g]etting back into dangerous mood. Hitting self when angry, going to Daddy's. [H]it step brother + stepmother + her self." (R. 281). However, plaintiff's mother had reported the previous month that plaintiff was probably not getting her medications while she was with her dad. (R. 287). Dr. George rated plaintiff's progress as "Good[.]" (R. 281). On June 23, 2008, Dr. George noted plaintiff's mother's report that, "Things better since back on meds. Dad + Stepmother saw change without meds. Without meds very hyperactive and mood swings." (R. 280). On July 14, 2008, Dr. George noted, "Very quiet and focused. Visit Dad did well when came bk. Gave meds." (R. 279). Dr. George next saw plaintiff on August 18, 2008, after she had started first grade. He wrote, "Mom – school going ok. Teacher helping her some. Sitting in front of board and desk. In mornings – doesn't want to get up. Temper at night. Meds 15 mg Ritalin 6:30 AM - 4 PM. Suggested discussing after school meds with Dr. Lopez. Cheerleading." (R. 278).

In his treatment note for the August 29, 2008 office visit, Dr. Lopez noted "cursing," "fighting," "losing wt," "pinches self[.]" ( R. 242). On September 5, 2008, Dr. Lopez wrote:

I have been treating this six-year-old Caucasian youngster for the past several years at different clinics. Her mother had brought her to Ozark, to Enterprise, and to Dothan, Alabama, where I am now.[21]

The psychiatric disorders that she presents are related to bipolar disorder, developmental delay, attention-deficit disorder, and oppositional behavioral disorder so much so that she has been hospitalized in a psychiatric unit for children at Laurel Oaks due to difficulties in adjusting to the home and school.

She had been tested in UAB and they reviewed notes in February. The mother reported that the pediatric neurologist had given this patient Equetro for abnormal EEG.  She is also taking Ritalin and she is in a one-on-one program in school. The mother reminded me that when she was in labor with the patient that she developed toxemia, which was a problem for the infant while in the uterus. This has caused numerous difficulties in addition to the genetic load for bipolar disorder in the father and on the mother's side.

On August 29, 2008, this youngster had shown different behaviors including fighting, losing weight, punching herself, hitting herself, and even cursing, something that we have not seen in the past. She was irritated with temper outburst. I think it was related to the use of Vyvanse and different ADHD medications, so we decided to switch it to Ritalin, which she has responded better before with 15 mg twice a day. All along she has been taking Abilify and mood regulator medication from 2.5 mg to 10 mg right now. She is also taking Trileptal now 150 mg twice a day, and the Equetro was discontinued. Numerous medication regimens have been tried and numerous remedial classes. Counseling with the mother and the youngster was continued for a long time. The youngster continued to be difficult.

She is going to need all the aforementioned counseling, medication regulation by psychiatrist, educational counseling, and even hospitalization periodically for treatment of relapses.

---

[21]   As noted above, plaintiff was first evaluated by Dr. Becerra and Dr. George on September 21, 2006, not quite two years before this September 5, 2008, report, and the first evaluation of record for Dr. Lopez occurred when plaintiff was "four and a half." (R. 191-95, 207-08, 232).  Unless such treatment was recorded on a form from Enterprise Behavioral Health Services in Enterprise or Southeast Psychiatric Services in Dothan, the record includes no record of plaintiff's treatment by Dr. Lopez in Ozark.  (See Exhibits 2F, 7F, 9F, 10F, 12F).

(R. 240). Dr. Lopez diagnosed bipolar disorder, ADHD, developmental coordination disorder, and oppositional defiant disorder.  He noted her medications, and that "she is seen by her pediatrician for medical problems and a therapist for further counseling and guidance." He concluded, "All these therapies are indicated and should be continued for years to come." (R. 241).  A month later, on October 6, 2008, plaintiff saw Dr. George. Dr. George noted that Dr. Lopez had changed plaintiff "back to Ritalin + Abilify" and that plaintiff was "[d]oing better." Dr. George noted plaintiff's mother's report that, during several days in which she was without medication, plaintiff cut up clothes and wrote on the floor; he further observed, "mood good. Very attentive."  (R. 277). At her next follow-up appointment with Dr. Lopez, on October 24, 2008, Dr. Lopez noted normal behavior and good memory and impulse control, and indicated no medication changes.  (R. 239).[22]

On October 21, 2008, plaintiff submitted a questionnaire completed by plaintiff's first grade teacher to the ALJ, as the ALJ had suggested during the September 23, 2008 hearing. (See R. 54-55, 150). The rating scale on the form provided to the teacher ranged from "1" through "5" with "1" reflecting "Not a problem[,]" "3" indicating "Noticeably interferes with academic or social success[,]" and "5" indicating "Very serious detriment to academic or social success." (R. 151). Plaintiff's teacher indicated that plaintiff's communicative

_____

[22]  Plaintiff's mother testified at the September 23, 2008, hearing that plaintiff was seeing Dr. Lopez "once a month for right now" and that "if everything is going okay, he sees her every two months." (R. 48).  The record before the court indicates that for the one year period from December 2007 through the date of the ALJ's decision in December 2008, Dr. Lopez saw plaintiff approximately every two months.  (See Exhibit 9F).

functioning and personal functioning are age appropriate, and noted no problems in these areas. (R. 152, 155). She rated plaintiff's fine motor skills as "3," observing that plaintiff's "handwriting is unsatisfactory" and her "art skills are poor." (R. 153, 154).[23] She rated the behaviors of "Injurious or hurtful behavior towards self[,]" "Disregard[] for safety rules[,]" and "poor hygiene and self-care skills" – which fall within the domain of "Caring for yourself" – at "1," indicating "[n]ot a problem." (R. 151, 154; see 20 C.F.R. § 416.926a(k)). In the area of "concentration, persistence or pace," the teacher indicated "1" in response to the prompt "Is impulsive." (R. 156). She rated all other behaviors listed in this section at a severity of "2" – i.e., between "Not a problem" and "Noticeably interferes with academic or social success" – and circled responses to indicate that they occur daily. (Id.).

On November 3, 2008, Dr. George observed no abnormalities in his mental status examination. He wrote, "Mood Good" and observed that plaintiff was relaxed and calm at play during the session. He noted plaintiff's mother's report that plaintiff had stopped Abilify and experienced increased mood swings, memory problems, and decreased behavior and grades at school and that she was put back on medication. (R. 278). The ALJ issued her decision the following month, on December 12, 2008. (R. 16-34).

---

[23] It appears that the form provided to the teacher was incomplete. (See R. 151-56 (teacher's note at R. 154 pertains to fine motor skills described in "Motor/Physical Functioning" section on previous page; behaviors/functions listed on page at R. 154 do not pick up with subparagraph (g), where the previous page left off but, instead, starts at subparagraph (a)); R. 155 (referring to "questions below" that do not appear on the form)).

**The Medical Source Statement**

On August 29, 2008, Dr. Lopez completed a form on which he circled responses to indicate that plaintiff suffers from manic syndrome characterized by hyperactivity, flight of ideas, easy distractibility, and "involvement in activities that have a high probability of painful consequences which are not recognized." (R. 235). He further checked "Yes," indicating his opinion that plaintiff suffers from limiting functional consequences that "preclude[] the child from performing a full range of age-appropriate activities." (R. 236). Although the form asked that he "please explain" a "Yes" response, Dr. Lopez did not do so. (Id.). Plaintiff contends that "[t]his assessment, if accepted by the ALJ, would have resulted in a finding that the severity of the child's mental impairment equals the requirements of § 112.04 of the Listings and she would be found disabled as a matter of law." (Doc. # 14, p. 7).

Dr. Lopez did not select responses indicating that plaintiff's impairment causes any of the limitations required to find that plaintiff meets Listing 112.04, *i.e.*, the "paragraph B" criteria. (Compare Listing 112.04(B)(incorporating "the age-group criteria in paragraph B2 of 112.02") and R. 235 (selecting none of the "B" criteria)).[24]   Neither did Dr. Lopez select

---

[24]   The "paragraph B" criteria included on the form completed by Dr. Lopez do not align precisely with the criteria applicable in evaluating child disability pursuant to Listing 112.04. Instead, the criteria listed on the form are the "paragraph B" criteria for Listing 12.04, which applies to adult claimants. However, two of the four criteria identified on the form correspond directly to those in the child listing: "deficiencies of concentration, persistence or pace" and "difficulties in maintaining social functioning." See R. 235; Listings 12.04(B) and 112.04(B) (incorporating 112.02(B) criteria). The remaining two "paragraph B" criteria for child disability – "[m]arked impairment in age-appropriate cognitive/communicative function" and "[m]arked impairment in age-

any responses indicating that plaintiff's impairment is medically equivalent to Listing 112.04.

(Compare 20 C.F.R. § 416.926(b)(1), (b)(2), and (b)(3)(identifying "three ways" to find medical equivalence) and R.236 (including no responses to the questions that correspond to § 416.926(b)(1), (b)(2), or (b)(3))). At most, Dr. Lopez' opinion that plaintiff has functional limitations that preclude her from performing "a full range of age-appropriate activities" goes to the question of functional equivalence. The ALJ acknowledged this, describing Dr. Lopez' assessment as "suggest[ing] the claimant's impairment functionally equals[.]" (R. 27). However, as the ALJ observed during the administrative hearing (R. 39-40), Dr. Lopez does not offer conclusions regarding plaintiff's level of functioning in all of the six domains encompassed in the functional equivalence analysis. In the section of the form setting forth the "paragraph B" criteria of Listing 12.04, Dr. Lopez was asked to evaluate whether his patient's manic syndrome resulted in, *inter alia*, "[m]arked difficulties in maintaining social functioning[,]" or "[d]eficiencies in concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner." (R. 235). Dr. Lopez did not select either of these choices as reflecting plaintiff's functional limitations. (Id.).

In her decision, the ALJ states, "The undersigned accords significant weight to the opinions of Dr. Lopez ... in Exhibits 2F, 6F, 7F, and 9F that shows the claimant is better with medication. The Administrative Law Judge accords lesser weight to Dr. Lopez's assessment

---

appropriate personal functioning" – do not correspond directly to the remaining two adult criteria of "[r]epeated episodes of decompensation, each of extended duration" and "activities of daily living." (Id.).

in Exhibit 8F that suggest the claimant's impairment functionally equals, which is inconsistent with his treatment notes and school evaluation and is way out of proportion to her functioning at school and his treatment notes showing improvement with medications." (R. 27).   Although she acknowledges the ALJ's rationale, plaintiff makes no argument that one of the reasons the ALJ articulates for discounting Dr. Lopez' assessment – *i.e.*, that Dr. Lopez' assessment is inconsistent with the school evaluation[25] and with plaintiff's functioning at school – is not supported by substantial evidence.  (See Plaintiff's brief, Doc. # 14, pp. 7-13).  Instead, plaintiff contends only that the ALJ's rationale is not supported by substantial evidence because "[plaintiff's] condition did not improve, as was supposed by the ALJ; rather, her condition deteriorated."  (Id., p. 8; see also id., pp. 7-13). The treatment notes cited by the ALJ, as well as those submitted to the Appeals Council,[26] reflect that plaintiff's condition improved in some periods and declined in others.  However, they reflect an overall trend of improvement with treatment during the relevant period and provide substantial evidentiary support for the ALJ's conclusion that Dr. Lopez' suggestion that her impairments functionally equal a listing is "inconsistent with his treatment notes" and "is way out of proportion to ... his treatment notes showing improvement with medications." (R. 27).

---

[25]  In the paragraph immediately preceding her assignment of weight to Dr. Lopez' opinion, the ALJ discusses the questionnaire completed by plaintiff's teacher (Exhibit 8E).  It is apparent that this is the "school evaluation" to which the ALJ refers.

[26]  "[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous."  Ingram v. Commissioner of Social Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).

The ALJ's determination that Dr. Lopez' opinion suggesting functional equivalence is inconsistent with plaintiff's school evaluation and her functioning at school is also supported by substantial evidence. (See Exhibit 8E and R. 49-50 (mother's hearing testimony)).  Thus, the ALJ did not err in according lesser weight to Dr. Lopez' assessment, to the extent it suggested that plaintiff's mental impairments functionally equal a listing.

### Plaintiff's Degree of Limitation in the Functional Domains

The ALJ found plaintiff to have functional limitations in all six of the functional domains – a "marked" limitation in the domain of acquiring and using information, and a "less than marked" limitation in the remaining five domains.  (R. 27-34).  Plaintiff contends that the ALJ committed reversible error by failing to assess "marked" limitations in the domains of attending and completing tasks, interacting and relating with others, and caring for yourself.  (Doc. # 14, pp. 13-15).

With regard to the domain of attending and completing tasks, plaintiff argues that "Drs. Lopez and George have made clinical finding of impaired concentration as well as hyperactive motor function and easy distractibility (Tr. 189, 188, 187, 182, 180, 230, 250, 256)... . The ALJ cites only the opinion of the non-examining state agency psychologist as support for her opinion (Tr. 29)." (Doc. # 14, p. 13).  The latter contention lacks merit entirely. (See R. 29)(ALJ's analysis of the domain of attending and completing tasks, discussing briefly and citing treatment records and teacher's evaluation).  The ALJ concluded her discussion of this domain by stating, "*The evidence as a whole* indicates claimant has less

than marked limitation in attending and completing tasks, which is consistent with the State Agency Physician, Dr. Eugene E. Fleece's opinion in Exhibit 1F." (R. 29)(emphasis added). The ALJ observed that plaintiff's teacher reported "*slight* problems in concentration, persistence or pace such as easily distracted; needs redirection to task; does not work independently; does not carry out detailed instructions; does not carry out simple instructions; does not maintain pace; does not complete tasks on time; and is fidgety, overactive or restless (Exhibit 8E)."  (R. 29 (emphasis added); see also R. 156 (noting daily problems in this area but rating them at a level "2" on a 5-point scale of increasing severity).  Additionally, in the treatment records plaintiff identifies as supporting "marked" limitations in this domain, the examining psychiatrist noted plaintiff's attention span to be "poor" on but a single occasion, on May 2, 2007.  (R. 250).  In each of the other cited treatment notes, the psychiatrist rated plaintiff's attention span as "Fair" – *i.e.*, at a level between the only two other options provided on the form, "Good" and "Poor[.]"  (See R. 189, 188, 187, 182, 180 (Dr. Becerra), R. 230 (Dr. Meghani) and R. 256 (Dr. Lopez)).[27]

---

[27]  As noted above, the ALJ observed that the "evidence as a whole" indicates "less than marked" limitation in this domain. Dr. Becerra noted plaintiff's attention span to be "Good" in a couple of the mental status evaluations. (R. 184, 185).  In his initial evaluation on September 21, 2006 – before plaintiff began taking medication – Dr. George observed that plaintiff "played throughout the interview in generally normal fashion although she was somewhat distractible with a somewhat elevated level of activity." (R. 207; see also R. 190, 195). In a function report she completed on November 13, 2006, plaintiff's mother marked "No" in response to the question, "Is the child's ability to pay attention and stick with a task limited?"  (Exhibit 3E, R. 137). During plaintiff's occupational therapy evaluation at UAB in December 2007, "[s]he did not appear to have difficulty attending to task and was easily re-directed[.]" (R. 210).  The following month, the speech/language evaluator at UAB observed that plaintiff "participated willingly in all testing items and did not need any reminders to attend to testing." (R. 221). In a psychological evaluation conducted in April 2008, Dr. George observed that "[plaintiff's] attention and concentration during

As to the domains of interacting and relating with others and caring for yourself, plaintiff argues that her conduct in running away from her mother and putting plastic bags over the heads of her younger sister and the family dog, and her psychiatric hospitalization at the age of five due to her "out of control" behavior evidences "marked" limitations.  (Doc. # 14, p. 14)(citing R. 180, 205-06, 240).  The specific evidence plaintiff cites in her argument as to these domains[28] pertains to incidents reported by plaintiff's mother on December 7, 2006, and January 30, 2007, to Dr. George (R. 205-06) and on February 1, 2007, to Dr. Becerra (R. 180), and to plaintiff's hospitalization in late June 2007.  The cited evidence, as well as other evidence of record, demonstrates that plaintiff has experienced limitations of varying degrees  in these domains at various times during the relevant period.  However, the record as a whole, including the evidence of plaintiff's behavior while in school and in

_____

the interview were within normal limits." (R. 283). He noted plaintiff's kindergarten teacher's reports of significant problems in completing her assignments and in paying attention (R. 283) but, also, that the teacher's "ratings overall indicate [that plaintiff] has shown ... significant improvement in her symptoms of inattention" (R. 282).  On May 20, 2008, Dr. George observed that, during the session, plaintiff "played on her own quietly." (R. 287). In plaintiff's six therapy sessions with Dr. George between June and November 2008, he noted her attention span to be "Good" on three occasions (R. 276, 280, 281) and did not rate her attention span on the remaining three visits (R. 277, 278, 279). The medical source statement form Dr. Lopez completed on August 29, 2008, provided an option for indicating that plaintiff's impairment resulted in "[d]eficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner," but Dr. Lopez did not select this option. (R. 235). At the administrative hearing on September 23, 2008, when asked by her attorney whether plaintiff had problems with ADHD and hyperactivity in school, plaintiff's mother testified, "She did at the beginning of Kindergarten because the medicine wasn't accurate right then, and the teacher let me know that she was fidgeting and moving a lot, and wasn't, wasn't focusing, and then when the medicine got corrected, she was doing a lot better."  (R. 50).

[28]  Plaintiff also refers to "[t]he above-cited treatment notes" but does not make any specific argument as to other evidence of record with respect to these domains.  (See Doc. # 14, p. 14).  The court has considered the record as a whole in evaluating plaintiff's arguments.

clinical settings, supports the ALJ's findings of "less than marked" limitations.

The ALJ did not conclude that plaintiff had *no* limitations in the domains of attending and completing tasks, interacting and relating with others, or caring for yourself.  The ALJ's findings that plaintiff's limitations were "less than marked" – findings that encompass "moderate" limitations[29] – are supported by substantial evidence of record.

## CONCLUSION

Upon consideration of the record as a whole and the arguments presented by the parties, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law and, accordingly, that it is due to be affirmed.  A separate judgment will be entered.

DONE, this 4th day of May, 2012.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[29] See 20 C.F.R. 416.926a(e)(2)(i)(marked limitation is "more than moderate" but "less than extreme").

37